IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KEITH ANTOINE WOOD, #256915,
     Petitioner     :

 v.          : CIVIL ACTION NO. RDB-03-2212

NANCY ROUSE, WARDEN[1] and  :
DOUGLAS F. GANSLER, ATTORNEY
GENERAL FOR THE STATE OF  :
MARYLAND
     Respondents   :

## MEMORANDUM OPINION

Before the Court is the *pro se* Petition for Writ of Habeas Corpus filed by Keith Antoine Wood (Paper No. 1), Respondents' Answer and exhibits filed in response thereto (Paper No. 7), the counseled Supplemental Memorandum of Law in Support of the Petition,[2] (Paper No. 50), the Response thereto (Paper No. 54), and Wood's Reply to the Response (Paper No. 58). After reviewing these papers, the Court finds no need for an evidentiary hearing. *See* Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts; *see also* 28 U.S.C. § 2254(e)(2). For reasons set forth below, the Court denies relief and dismisses the Petition with prejudice.

## Procedural History

On November 3, 1995, Wood was charged in the Circuit Court for Prince George's County with murder, use of a handgun in the commission of a crime of violence, assault, and

---

[1]  The Clerk shall be directed to substitute Nancy Rouse and Douglas F. Gansler as the proper Respondents in this case.

[2]  The Court thanks court-appointed counsel for his diligent and skilled representation of his client in this Court, the United States Circuit Court of Appeals for the Fourth Circuit, and the Maryland circuit and appellate courts.

carrying a handgun. (Paper No. 7, Exhibit 1 at 2).  After a three-day trial, a jury convicted Wood

of second-degree murder, use of a handgun in the commission of a crime of violence, and carrying

a handgun.[3]  (*Id.*, Exhibit 4 at 90).  On June 28, 1996, Wood was sentenced to thirty years

imprisonment for the murder conviction and a consecutive twenty-year term of incarceration for the

handgun violation.[4]

On direct appeal, Wood argued that the trial court erred in denying his motion for judgment

of acquittal as to first-degree murder.  (*Id.*, Exhibit 6).  The Court of Special Appeals of Maryland

rejected this argument in a *per curiam* opinion issued on April 7, 1997. (*Id.*, Exhibit 8).  The Court

of Appeals of Maryland denied Wood's application for *certiorari* review on June 27, 1997.  (*Id.*,

Exhibit 9).

On June 7, 1997, Wood initiated post-conviction proceedings in the Circuit Court for Prince

George's County.   In an amended counseled petition, he argued that trial counsel provided

ineffective assistance by: (1) allowing a State's witness to refuse to testify in front of the jury and

failing to renew objection to the State's inquiry; (2) failing to adequately investigate, prepare, and

present the case; (3) misstating the basis of prosecution witness Garland Johnson's refusal to testify;

(4) failing to object to the State's improper closing argument concerning Johnson's refusal to testify;

and (5) failing to object to the State's use of an impermissibly suggestive identification procedure

while also failing to move for an in-camera suppression hearing.  Wood also alleged that (6) his

---

[3]	Stripped to bare essentials, evidence presented at trial demonstrated that James Wallace was shot
to death on June 27, 1992.  The State claimed Wood shot Wallace after a physical altercation involving Joseph
Ward, Wallace's friend, and Garland "Bey-Bey" Johnson, Wood's friend, concerning a debt Ward owed to Wood.
State's witnesses Teagan Young and Kenneth Gregory Jeffers, friends of both Ward and the victim, were present at
the time of the shooting.

[4]	The remaining sentence merged into the sentence for use of a handgun in the commission of a
crime of violence.  *Id.*, Exhibit 5 at 5.

identification by State's witness Jeffers was impermissibly suggestive; and (7) the State's Attorney committed misconduct by suppressing exculpatory evidence and making an improper closing argument. (*Id.*, Exhibits 11-13). Following an evidentiary hearing on October 18, 1999, the post-conviction court issued a revised Opinion of Court on January 10, 2000, finding ineffective assistance of trial counsel, prosecutorial misconduct, and judicial error and granting Wood a new trial.

On April 20, 2001, the Court of Special Appeals of Maryland granted the State's application for leave to appeal to consider whether the post-conviction court erred in granting a new trial. On May 29, 2002, the intermediate appellate court reversed the post-conviction court's decision in a sixty-three-page opinion. (*Id.*, Exhibit 20). Wood's application for certiorari review was summarily denied by the Court of Appeals of Maryland on September 12, 2002. (*Id.*, Exhibits 21 and 22).

On July 29, 2003, Wood sought habeas corpus relief in this Court. In his Petition, as supplemented, and brief, he asserts that trial counsel was ineffective for failing to: (1) renew objection to the State's questioning of Garland Johnson concerning inadmissible evidence; (2) object to the State's reference to inadmissible evidence in closing argument; (3) attempt to suppress identifications; (4) use available character witnesses and/or call Wood to testify; and (5) obtain adequate pretrial discovery. Wood further asserts that the State's Attorney improperly: (6) questioned Johnson about an inadmissible statement and then based closing argument on same; and (7) withheld identification evidence favoring the defense. (Paper No. 1, ¶ 14.A-C.).

## **Threshold Considerations**

### **Timeliness**

Respondents do not contend, and the Court does not find, that the Petition was filed outside

the one-year limitations period set forth in 28 U.S.C. § 2244(d)(1).

## Exhaustion of State Remedies

Under *Rose v. Lundy*, 455 U.S. 509 (1982), those petitioning for federal habeas corpus relief must first exhaust each claim by pursuing remedies available in state court.  This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim.  *See* 28 U.S.C. §§ 2254(b)-( c); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).  In Maryland, this may be accomplished by proceeding with certain claims on direct appeal (and thereafter seeking *certiorari* to the Court of Appeals) and with other claims by way of  a post-conviction petition, followed by petitioning the Court of Special Appeals for leave to appeal.  Wood no longer has any state direct review or collateral review remedies available to him with respect to the claims raised in this Court and accordingly, his claims will be considered exhausted for the purpose of federal habeas corpus review.

## Procedural Default

Respondents contend that Wood's five ineffective assistance of counsel claims should be rejected in whole or in part on procedural default grounds. Wood argues that by filing a motion to reopen state post-conviction proceedings, he has exhausted state court review of these claims because he has given the state courts "an opportunity to act," in accord with *Rose v. Lundy*, 445 U.S. at 515.  He further contends that "in order to preclude federal review, 'the state court must actually have relied on [a] procedural bar as an independent basis for its disposition of the case.'" *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985); *Jenkins v. Hutchinson*, 221 F.3d 679, 682-83 (4th Cir. 2000).

The procedural default doctrine ensures that "state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding." *Picard v. Connor*, 404 U.S. 270, 276 (1971).  In *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), the Supreme Court held that consideration of a claim in a petition for habeas corpus can be barred by failure to comply with state procedural rules, unless the petitioner makes a showing of cause for the failure and prejudice resulting from the failure. In *Harris v. Reed,* 489 U.S. 255, 267 (1989), the Court emphasized that a federal court has the responsibility to determine whether a state court in fact based its denial of relief on procedural grounds.  In *Teague v. Lane*, 489 U.S. 288, 299 (1989), however, the Court determined that the rule announced in *Harris v. Reed* assumes that a state court has had the opportunity to address a claim that is later raised in a federal habeas proceeding.  *See id*. at 299. Thus, claims which have never been presented in the state courts -- or claims which were not exhausted properly in the state courts -- are procedurally defaulted if presentation of the claims in state court would be barred by state procedural rules.  *See Johnson v. Maryland*, 915 F.2d 892, 895 (4th Cir. 1990).

Claims 1, 4, and 5[5] were addressed in post-conviction proceedings in the Circuit Court, but were not pursued by counsel[6] in the appellate procedures that followed the grant of post-conviction relief.[7]  Claim 2 was raised in the post-conviction petition but not addressed by the post-conviction

---

[5]     These claims alleged ineffective assistance for failing to: renew objection to the State's questioning of Johnson concerning inadmissible evidence; use available character witnesses or call Wood to testify; and, obtain adequate pretrial discovery.

[6]     Fred Warren Bennett, an attorney with decades of state and federal criminal trial, appellate and post-conviction experience, represented Wood in the appellate procedures that followed the grant of post-conviction relief.

[7]     The Circuit Court granted post-conviction relief on Wood's claim of ineffective assistance as it related to the failure to object to pretrial identification procedure (Claim 3 here), and also on the claims concerning prosecutorial misconduct (Claims 6 and 7).  Respondents successfully sought leave to appeal the Circuit Court

court in its decision, and not raised on cross-appeal.  Thus, these claims were not exhausted at the state court level and were subject to procedural default here.  Wood contended that the failure to pursue those claims on appeal constituted ineffective assistance of post-conviction appellate counsel and arguably provided a sufficient basis to reopen post-conviction review in the Circuit Court.  Based on this contention, this Court appointed counsel, held the instant action in abeyance, and accorded counsel time to exhaust all state court remedies by petitioning the Circuit Court to reopen post-conviction proceedings in an attempt to complete review of these forfeited claims.  (Paper No. 19, Memorandum and Order of March 30, 2004).

On March 14, 2006, Wood through counsel filed a motion to reopen state post-conviction proceedings on grounds that: (1) post-conviction counsel failed to notify Wood that he had a right to seek leave to appeal in connection with claims rejected by the post-conviction court; (2) the post-conviction court did not advise Wood of the denial of some of his claims; (3) trial counsel was ineffective in her investigation and presentation of Wood's case; and (4) post-conviction counsel conducted an inadequate investigation of the case.  *Id.*, Exhibit 24.  After consideration of the motion to reopen and Respondents' objection thereto (*id.*, Exhibit 25), the Circuit Court found it "not in the interests of justice to reopen the...post-conviction case, as the allegations contained in the...motion are without merit...." (*Id.*, Exhibit 27).[8]

_____

decision.  Wood did not then file a cross-application for leave to appeal from the Circuit Court's decision denying the other four ineffective assistance claims.  Paper No. 7, Exhibit 15 and Exhibit 20 at 14 n. 6 and 41 n. 8 (Maryland Court of Appeals acknowledgment regarding lack of cross-appeal and delineating issues not before it).  After the state intermediate appellate court reversed the Circuit Court's decision, Wood failed to pursue his first, fourth and fifth claims of ineffective assistance in his petition for writ of certiorari to the Maryland Court of Appeals.  *Id.*, Exhibits 19 and 21.

[8]     Respondents requested the court clarify its decision to reflect that it was not deciding the merits of Wood's claim with respect to trial counsel's performance, but instead was denying reopening because Wood had not stated meritorious grounds for excusing the waiver of the claim that occurred by virtue of Wood's failure to challenge trial counsel's performance in a cross-motion for leave to appeal when the Court of Special Appeals

Wood then sought leave to appeal the Circuit Court's denial of the motion to reopen post-conviction proceedings, on grounds that: (1) post-conviction counsel and the post-conviction court erred in failing to properly advise Wood of his appellate remedies; (2) trial counsel was ineffective for failing to locate and call to the stand certain character witnesses; and (3) post-conviction counsel was ineffective for failing to call the character witnesses to testify at the post-conviction hearing. (*Id.*, Exhibit 30).   On November 9, 2006, the Court of Special Appeals summarily denied the application for leave to appeal.   (*Id.*, Exhibit 31).   Counsel then moved to reactivate the instant petition.

The state courts found no meritorious basis for reopening post-conviction proceedings.  Put another way, the state courts found no reason the forfeited claims could not have been fully presented at all stages of the initial post-conviction proceedings.[9]  This Court concurs.  A federal court may nonetheless consider the merits of procedurally defaulted claims if a petitioner shows either (1) cause for the procedural default and actual prejudice arising out of the violation of federal law, *see Wainwright,* 433 U.S. at 87, or (2) a resulting fundamental miscarriage of justice if the federal court does not consider the claims.  *See Gray v.  Netherland*, 518 U.S. 152, 160 (1996); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Wood has not met the first exception to the procedural default doctrine by showing cause for the default.[10]   The second exception, the miscarriage of justice standard, is directly linked to

---

granted the State leave to appeal the post-conviction court's decision granting relief.  (*Id.*, Exhibit  28).  The request for clarification was denied.  (*Id.*, Exhibit 29).

[9]       In any event, infirmities in state post-conviction proceedings cannot serve as a basis for federal habeas corpus relief.  *See Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988).

[10]       Thus, Wood has properly exhausted only the portion of his third claim concerning ineffective assistance of counsel related to the failure to object to the pretrial identification procedure, and the sixth and seventh claims regarding prosecutorial misconduct.

innocence.  *Schlup v. Delo*, 513 U.S. 298, 320 (1995).  Innocence is not an independent claim;

rather, it is the "gateway" through which a petitioner must pass before a court may consider

constitutional claims which are defaulted.  *Id.*; *see also   Murray v. Carrier*,  477 U.S. 478, 496

(1986).  To meet this standard Wood must show it is more likely than not that no reasonable juror

would have found him guilty beyond a reasonable doubt. *Id.*

> *Schlup* observes that:

> a substantial claim that constitutional error has caused the conviction of an
> innocent person is extremely rare . . . To be credible, such a claim requires
> petitioner to support his allegations of constitutional error with new reliable
> evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness
> accounts, or critical physical evidence--that was not presented at trial**.**

*Id*. at 324; *see also House v. Bell*, 126 S. Ct. 2064, 2077-78 (2006).

Wood has failed to present such evidence, and review of the record does not suggest that it

exists.  Petitioner has failed to overcome the procedural bar.  Thus, Claims 1, 2, 3 (except that

portion of the claim concerning ineffective assistance of counsel related to the failure to object to

pretrial identification procedure), 4 and 5 are procedurally defaulted and foreclosed from federal

habeas review.[11]

### Standard of Review

Because this Petition was filed after April 24, 1996, it is to be decided under amendments

to the habeas corpus statutes contained in the Antiterrorism and Effective Death Penalty Act

---

[11]       The Fourth Circuit deems it appropriate to address the merits of claims where it is uncertain
whether a state procedural rule could be properly considered adequate and independent grounds for invoking the
procedural default doctrine.  *See Burket v. Angelone*, 208 F.3d 172, 184 (4th Cir. 2000) (reviewing merits of habeas
corpus claims where scope of procedural bar was unclear); *Bacon v. Lee*, 225 F.3d 470, 477 (4th Cir. 2000); *Royal v.
Taylor*, 188 F.3d 239, 248 (4th Cir. 1999); *see also concurring opinion, McNeill v. Polk*, ___ F.3d ___, 2007 WL
258174, ** 9-10 (4th Cir. 2007).  In any event, the determinations by the first post-conviction court denying Wood's
claims of ineffective assistance of counsel (Paper No. 7, Exhibit 15 at 2-7) appear reasonable and will be upheld
here pursuant to 28 U.S.C. §2254(d).

("AEDPA").  *See Woodford v. Garceau*, 538 U.S. 202, 207 (2003); *Beck v. Angelone*, 261 F.3d 377, 380 n.3 (4th Cir. 2001).   AEDPA modified the federal court's role in habeas proceedings in order to prevent federal "retrials" and to ensure that state court convictions are given effect to the extent possible under law.  *See Bell v. Cone*, 535 U.S. 685, 693 (2002).  Pursuant to statute, a federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits:

> 1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> 2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "contrary to" Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in our cases."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).[12]  Section 2254(d) also requires federal courts to give great deference to a state court's factual findings.  *See Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct absent clear and convincing evidence to the contrary.   A petitioner has the burden of rebutting the presumption of correctness, and a decision adjudicated on the merits in a state court and based on

---

[12]  Although § 2254(d) is a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), "which demands that state court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*), a state court decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 at 412-413.  A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*.  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id*. at 409-410; *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Booth-el v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002).

a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.  *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Stroud v, Polk*, 466 F.3d 291, 295 (4th Cir. 2006).  Using this framework, the  undersigned now examines Wood's remaining claims of ineffective assistance of counsel and prosecutorial misconduct.

### Analysis of Petitioner's Undefaulted Claims

#### Ineffective Assistance of Trial Counsel

To establish a claim of ineffective assistance, a petitioner must show that "counsel's re-presentation fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different."  *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  With regard to the first prong of this test, the district court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Id.* at 690.  All circumstances are to be considered, and the court's scrutiny of counsel's conduct must be "highly deferential."  *Id.* at 688-89.

Even if it is determined that counsel committed a professionally unreasonable error, relief can be granted only if "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  A federal writ can be granted only if a state court decision "was contrary to, or involved an unreasonable application of, clearly established" precedents of the Supreme Court. 28 U.S.C. § 2254(d)(1). This "unreasonable application" prong permits the writ to be granted when a state court identifies the

correct governing legal principle but unreasonably applies it to the facts of a petitioner's case. *See Williams v. Taylor*, 529 U.S. at 413. For this standard to be satisfied, the state court decision must have been "objectively unreasonable," *id*. at 409, not just incorrect or erroneous.

Wood contends that he received ineffective assistance because counsel failed to object to the State's improper pretrial identification procedure. The post-conviction court agreed:

> One of the State's witnesses, Greg Jeffers, testified that the police had shown him a single photograph of [Wood] with [Wood's] name on it. The display of a single photograph of the suspect alone is one of the most suggestive and objectionable methods of pretrial identification. *Manson v. Brathwaite*, 432 U.S. 98 (1977). Trial counsel should have objected to this identification procedure, and there being no explanation as to her failure to do so leads this Court to conclude that this failure could have been highly prejudical to...[Wood].

(Paper No. 7, Exhibit 15 at 7). The Court of Special Appeals, however, in an exhaustive sixty-two page opinion, determined that the post-conviction court incorrectly concluded that the State showed Jeffers just one photograph. (*Id*., Exhibit 20 at 5, 16-17, 47-49). The appellate court then outlined the *Strickland* standard and found the record did not support a finding of prejudice with regard to the photographic identification:

> [T]here is no reasonable basis to conclude that any error of defense counsel with respect to the photographic identification affected the outcome of the trial, or that defense "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having a just result."

(*Id*., Exhibit 20 at 62-63). Support for this decision is firmly grounded in the trial transcript. Teagan Young, who knew all those present at the crime scene, including Wood, described the circumstances leading up to the incident as well as the shooting, in detail. (*Id.,* Exhibit 3 at 35-41). Jeffers, who suffered head and facial injuries in a car accident prior to trial,[13] knew the victim well and also was

---

[13] It is unclear whether Jeffers 's memory was impaired from the accident, or due to the passage of time, given that Wood's arrest and subsequent trial occurred more than three years after the crime. In either event, the State used Jeffers's statement to police to refresh his recollection. *Id*., Exhibit 3 at 59, 65-72

present at the time of the murder, which resulted from "a misunderstanding," during which "the

other guy (not Wallace) went and got a gun and shot" Wallace.  Jeffers identified the shooter as

"Keith, the dude, the one that got the gun and came back."  When the prosecutor asked Jeffers if he

knew "Keith's last name," Jeffers said, "yeah, Wood."  When asked by the prosecutor whether

Jeffers knew Wood prior to the incident, Jeffers replied: "No.  I didn't know him.  I didn't seen [sic]

him.  I don't even remember seeing him before then."  Jeffers acknowledged, however, that he gave

the police a statement on June 6, 1992, nine days after Wallace's death.  When police asked him how

long he knew Wood, Jeffers answered: "I don't know him, but I see him off and on."  At the time

of questioning, Jeffers knew "Keith's" last name to be Wood.  (*Id.*, Exhibit 3 at 59-71).

The Court of Special Appeals provided the following analysis of the claim:

> The claim of impermissible suggestiveness in regard to a photographic
> identification is founded upon principles of due process.  *See Moore v. Illinois,*
> 434 U.S. 220, 227; *United States v. Wade*, 388 U.S. 218 (1968); *Stovall v. Denno*,
> 388 U.S. 293 (1967).  Due process "protects the accused against the introduction
> of evidence of, or tainted by, an unreliable pretrial identification obtained through
> unnecessarily suggestive procedures."  *Moore*, 434 U.S. at 227 [citations omitted].
> It also guards against an "'irreparable mistaken identification.'" [Citation omitted].
> The due process claim must be evaluated based on the totality of the circumstances.
> [Citation omitted].

> A due process challenge to an extra-judicial identification requires a two-
> stage inquiry. [Citation omitted].  The first inquiry is "whether the identification
> procedure was impermissibly suggestive." [Citation omitted].  An identification
> procedure may be suggestive, where, in effect, the police suggest to the witness,
> "This is the man."  *Foster v. California*, 394 U.S. 440, 443 (1969).  If the identi-
> fication procedure was not unnecessarily suggestive, then the inquiry ends and the
> extra-judicial identification and in-court identification evidence is admissible.
> [Citation omitted].  Only if the procedure is found to be impermissibly suggestive
> will the suppression court proceed to the second inquiry: "whether, under the
> totality of the circumstances, the identification was reliable." [Citation omitted].

> The defense bears the initial burden of showing impermissible suggestive-
> ness. [Citation omitted].  If a *prima facie* taint is shown, the State is then required
> to prove, by clear and convincing evidence, that the "reliability of the identification

...outweighs the corrupting effect of the suggestive procedure." [Citation omitted]. "Reliability, not suggestiveness, is the linchpin in making the determination of admissibility and thus avoiding any substantial likelihood of misidentification." [Citation omitted].

Certainly, the risk of prejudice "'will be increased if the police display to the witness only one picture of a single individual who generally resembles the person he saw, or if they show him pictures of several persons among which the photograph of a single individual recurs or is in some way emphasized.'" *King v. State*, 18 Md. App. 266, 270 (1973), (quoting *Simmons v. United States,* 390 U.S. 377, 383 (1968). [Wood] concedes, however, that neither a one-on-one confrontation nor the display of a single photograph of a suspect to a witness is, without more, grounds for excluding evidence of an extrajudicial identification.... *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (identification arising from single-photograph display may be viewed in general with suspicion but exigent circumstances may justify presentation of a single photograph). Rather, "The test of admissibility is 'whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive.'" *Webster [v. State,* 299 Md. 581, 601 (1984)] (quoting *Neil v. Biggers*, 409 U.S. 188, 199 (1972).

If a pretrial identification is found suggestive, several factors are relevant to evaluate the likelihood of misidentification. Relying on *Neil v. Biggers*, 409 U.S. 199-200, the *Webster* Court identified the following criteria: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; (5) and the length of time between the crime and the confrontation. [Citation omitted].

* * * *

[Wood] contends that, if the State had disclosed that Jeffers identified Wood based on a single photograph shown to him, the defense would likely have obtained the suppression of Jeffers's out-of-court identification and "perhaps" the in-court identification. As we have said, assuming, *arguendo*, that Jeffers saw just one photograph, his identification would not necessarily have been suppressed, because the State could establish its reliability, under *Biggers*. Looking at the factors pertinent to that assessment, we are not aware of any basis to indicate that the identification was unreliable....

* * * *

The post-conviction court found that Wood received ineffective assistance of counsel because his lawyer failed to object to the State's improper pretrial iden-

-13-

tification procedure.  Under the heading of "*Counsel failed to object to the State's use of an impermissibly suggestive identification procedure and failed to move for an in-camera suppression hearing,*" the court said:

> One of the State's witnesses, Greg Jeffers, testified that the police had shown him a single photograph of [Wood] with [Wood's] name on it.* The display of a single photograph of the suspect alone is one of the most suggestive and objectionable methods of pretrial identification. *Mason v,. Brathwaite*, 432 U.S. 98 (1977).  Trial counsel should have objected to this identification procedure, and there being no explanation as to her failure to do so leads this Court to conclude that this failure could have been highly prejudicial to...[Wood].

———

> \*      As we previously determined the post-conviction court incorrectly concluded that the State showed Jeffers just one photograph.

(Paper No. 7, Exhibit 20 at 49-56).  After reiterating the *Strickland* standard, the appellate court concluded that, the post-conviction court's finding to the contrary, the record did not support a finding that Wood was prejudiced by trial counsel's failure to object to the photographic identification, or to support a finding that defense counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having a just result."  (*Id*. at 62-63, quoting *Strickland*, 466 U.S. at 686).  The Maryland Court of Special Appeals reasonably applied the law to the facts of this case, finding no deficiency with regard to counsel's failure to object to the pretrial identification procedure used in this case.  This finding will not be disturbed here.

### Prosecutorial Misconduct

Wood contends that the prosecutor's closing argument violated due process because it implied that Garland Johnson – had he testified – would have implicated Wood in the murder.  He argues that the prosecutor intentionally made improper, inadmissible commentary "on what essentially amounted to a non-event, Johnson's refusal to testify," making the  misconduct "especially egregious."  (Paper No. 50 at 10).

-14-

As noted earlier, State witnesses Teagan Young and Kenneth Jeffers testified the victim was shot multiple times by Wood after intervening in a fist fight between Joseph Ward and Garland Johnson. (Paper No. 7, Exhibit 3 at 35-38, 62-65). The State then sought to call Johnson to the stand. (*Id*. at 76). Outside the jury's presence, Johnson, represented by counsel, indicated his intent to invoke the Fifth Amendment privilege against self-incrimination. (*Id*. at 86-87). The trial court granted the State's motion to compel Johnson's testimony in return for immunity. (*Id*. at 87-90). Johnson acknowledged he understood the grant of immunity meant he could not assert the Fifth Amendment and was compelled to testify, and stated that he nonetheless would refuse to do so. (*Id*. at 90).

The trial court then informed the State that it could not proceed to question Johnson about the statement he gave police because it would be impossible for Wood to cross-examine the statement. (*Id*. at 92). The State argued that Johnson was not unavailable because he did not have the right to refuse to testify and, accordingly, his prior statement could be admitted as substantive evidence and shown in front of the jury. (*Id.* at 92, 94-95) The court disagreed, indicating "[The prosecutor] can ask him his name, and if he refuses to answer...then we're at a point where I'm going to simply order him to testify. And if you ask another question, and he refuses to testify, I'm going to send him on the road." (*Id*. at 95). The court indicated the State would not be allowed to keep questioning Johnson regarding his statement at that point because it would amount to testimony from the prosecution. (*Id*.). The court again indicated that "[w]hen he refuses to testify, he is in violation of my order to testify...so basically it's probably only one question, and not two, and [at] that point, he goes to jail." (*Id*.). Later, the court reiterated that "my ruling is that this statement, this witness's statement...cannot be used as substantive evidence...[Y]ou can't get into the substance of the

statement."  (*Id.* at 97-98).

The following testimony then proceeded before the jury:

[The Court]     Back on the record.  The witness was sworn.  Mr. Garland Johnson, the court has signed an order compelling you to testify in this case.  Do you under-stand that?

[Garland Johnson]     Yes.

[Assistant State's Attorney]   Mr. Johnson, didn't you give a statement to the -

[Defense Counsel]     Objection.

[Assistant State's Attorney]   I didn't finish the question.

[The Court]     Finish the question.

[Assistant State's Attorney]   Didn't you give a statement to the police in this incident?

[Garland Johnson]     I'm exercising my rights.

[The Court]     What does that mean?  You're refusing to testify?

[Garland Johnson]     Yes.  Yes.

[The Court]     I've ordered you to testify.  You're refusing to testify?

[Garland Johnson]     Yes.  Yes.

[The Court]     The Court holds you in direct contempt, and I sentence you to 179 days in jail.  Go with the sheriff.

(*Id.* at 98-99).  In closing argument, the prosecutor made the following remarks:

Ladies and gentlemen, we had another witness for you, too.  We brought in Garland Johnson to tell you what happened, because after all, Garland Johnson was Keith's man.  Garland Johnson was the one who was fighting this debt with Joe Ward for Keith.  We brought him in, too.  But strange thing about Garland Johnson was, was that he didn't want to talk to you.  He did not want to tell you what happened.  The judge ordered him to testify, ordered him to talk to you,

-16-

and to tell you the truth, to tell you what happened.  I asked him one question, "Didn't you give a statement to the police?"  His answer, "I don't want to answer. I'm not going to answer any questions," after a Court order to answer questions and to tell the truth, "I'm not going to do it."

        The Court found Garland Johnson in contempt. [The Court] found Garland Johnson in direct contempt of court because he stood up in front of you and everyone in this courtroom and refused to tell you what happened.  Garland Johnson would rather do 179 days in jail than to tell you the truth about what happened in this incident, and what does that tell us?  This man would rather do 179 days in jail than to tell you the truth about what happened out there. And isn't it odd that Garland Johnson, Keith Wood's man, was found to be in the company of Keith Wood when he was arrested in August of 1995.  Isn't that odd.  That tells us either that Garland Johnson is afraid of Keith Wood – I wonder why, or it tells us that Garland Johnson is so connected out of some misguided sense of loyalty to Keith Wood, that he would rather go to jail than to tell you how Keith Wood murdered James Wallace.  It doesn't matter which one it is, because Garland Johnson didn't say anything to us.

(*Id*., Exhibit 4 at 68-69).

During closing argument, Wood's counsel countered the State's argument:

        Garland Johnson was the next witness the State called.  Garland Johnson, Bey-Bey, invoked his Fifth Amendment right against self-incrimination.  That is what the Fifth Amendment says, self-incrimination.  He is not here to hide to protect Mr. Wood, as the State would have you believe.  He has taken the Fifth Amendment to protect himself.  And why is that important?  Well, I think from his behavior on the stand, he is going to jail for six months.  Do you think he's trying to protect Mr. Wood?  Would anybody in their right mind go to jail for six months to protect anybody else?  But why would he take the Fifth Amendment to protect himself?  Because, again, he is the shooter in this case.

(*Id*. at 81-82).

The State in rebuttal added the following:

        Now, the other thing that [defense counsel] said was that Garland Johnson took the Fifth Amendment.  Well, you sat here just like I did.  Garland Johnson didn't take any Fifth Amendment.  Garland Johnson didn't say, "I refuse to testify on the grounds that it might incriminate me."  The judge told him he had to testify.  He had no Fifth Amendment [privilege].  Garland Johnson said, "I will not answer your question."  He didn't say, "I take the Fifth.  I don't want to testify because it might incriminate me."  He said, I

will not answer your question. "I will answer nothing you ask...."  He didn't
say it was because it was going to incriminate him.  We know why he didn't
answer the question.

(*Id.* at 87-88).

The post-conviction court found prosecutorial misconduct because:

The cumulative effect of the following greatly prejudiced [Wood]: (1) in
the presence of the jury the court allowed Johnson to refuse to testify, then sentenced
him for contempt; (2) [the prosecutor] questions Johnson about the police statement
in the presence of the jury, and (3) [the prosecutor] improperly inferred in closing
argument that [Wood] was implicated by Johnson.

The Supreme Court has identified two principle theories in analyzing
prejudicial error where it is known that a witness will refuse to testify based on
the privilege against self-incrimination.  First, "error may be based upon a concept
of prosecutor misconduct, when the government made a conscious and flagrant
attempt to build its case out of inferences arising from the use of testimonial
privilege."  *Namet v. United States*, 373 U.S. 179, 186 (1963).  Second, it may be
appropriate to consider whether "inferences from a witness' refusal to answer
added critical weight to the prosecution's case...."  *Id.* at 187.  Under this theory the
Supreme Court noted the danger of allowing the jury to consider inferences in a
form not subject to cross-examination.  *Atkins v. State*, at pp. 5-6.  The effect of all
the errors justifies a reversal of [Wood's] conviction.

(*Id.*, Exhibit 15).   The Court of Special Appeals examined this decision, and found as follows:

Preliminarily, we observe that the post-conviction court made several
findings as to prosecutorial misconduct, ineffective assistance of defense counsel,
and trial court error as to matters that Wood never raised in his Petition.  For
example, the post-conviction court indicated that Wood complained about his
lawyer's failure to object or move for mistrial "when the Court allowed Johnson
to take the stand in front of the jury....when the State questions Johnson about
his prior police statement in front of the jury, and failure to object to Johnson
being sentenced for contempt in front of the jury...."  As best we can determine,
however, Wood did not argue that his lawyer was ineffective for failing to object
to the State's decision to call Johnson as a witness, knowing of his refusal to
testify, or for failing to challenge the contempt sentence.  In a related context,
Wood did not claim prosecutorial misconduct with respect to the State's question
to Johnson about his statement to the police, nor did Wood attack as error the
court's action in sentencing Johnson for contempt in the jury's presence.  Rather,
as to Johnson, Wood alleged only that his attorney was ineffective for failing
to renew her objection to the prosecutor's question, and for failing to object to

the State's closing argument.  In both instances, Wood claimed the State improperly suggested that Johnson had implicated Wood.

On the other hand, the State has not claimed that Wood failed to preserve the issues on which the post-conviction court ultimately based its decision, or that the post-conviction court's rulings are invalid because they address issues that Wood never raised.  Put another way, even if Wood could have been found to have waived the contentions on which the court actually rules, the State has not claimed waiver.  In effect, then, this case presents a waiver of a waiver; the State has waived any claim that Wood waived such claims.  Therefore, we shall proceed to address the merits of the post-conviction court's rulings.

We shall include additional facts in our discussion.

DISCUSSION

A.  Garland Johnson

The post-conviction court granted Wood a new trial based on the following errors relating to Johnson:

> 1)      The error by the prosecutor and trial court in regard to calling Johnson as a witness, knowing he would refuse to testify, and having Johnson assert his refusal to testify in the jury's presence;

> 2)      The State's "shocking" conduct in questioning Johnson about his pretrial statement, in violation of the trial court's instructions;

> 3)      The court's "highly improper" action in imposing the contempt sentence in the jury's presence;

> 4)      The State's improper closing argument, in which it implicated Wood based on Johnson's refusal to testify.

1.  Johnson's refusal to testify

Johnson refused to testify at trial on the ground that he was exercising [his] rights."  Relying on *Bhagwat v. State*, 338 Md. 263 (1995), *Allen v. State*, 318 Md. 166 (1989), and *Adkins v. State* , 316 Md. 1 (1989), the post-conviction court observed that "it is reversible error for a trial court to allow any exposure to the jury of a witness who refuses to testify after invoking his Fifth Amendment privilege...."

The privilege against compelled self-incrimination is guaranteed under the Fifth Amendment to the United States Constitution and Article 22 of the Maryland Declaration of Rights. *See Gray v. State*, __ Md. __, No. 37, September Term, 2001, slip op. at 21 (filed April 11, 2002); *Adkins*, 316 Md. at 7. Article 22 is generally *in pari materia* with its federal counterpart. *Atkins*, 316 Md. at 6, n. 5; *Richardson v. State*, 285 Md. 261, 265 (1979). Upon assertion of the privilege, the trial court must decide "1) whether there is a reasonable basis for invocation of the privilege; and 2) whether the privilege is invoked in good faith." *Bhagwat*, 338 Md. at 272; *see Gray*, slip op at 2 n.1; *Richardson*, 285 Md. at 265; McLain, *Maryland Evidence*, § 514.1, at 605 (1987). In *Baghwat*, 338 Md. at 272-73, the Court explained:

> The test of the witness's entitlement to invoke the privilege against self-incrimination...was well stated in *Choi v. State*, 316 Md. 529, 560 A.2d 1108 (1989). It is whether "the witness has reasonable cause to apprehend danger from a direct answer," [citation omitted], and whether it is "evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." [Citation omitted].

The State concedes in its brief that, "[i]f the parties know or have reason to know that a witness will assert his Fifth Amendment right to remain silent, under most circumstances, it is improper to call the witness to the stand and have him invoke the privilege in front of the jury." [Citations omitted]. Rather, the court ordinarily makes "the necessary determination in open court but *outside the presence of the jury.*" [Citations omitted; emphasis in text]. Nevertheless, the State argues that it was not improper to call Johnson, because he had "no privilege to invoke," given the use immunity conferred upon him pursuant to C.J. § 9-123.

In *Baghwat*,...the Court considered "[w]hether the proper procedure concerning the invocation of a witness's privilege against self-incrimination was followed[.]" The defendant's brother was a co-defendant, and the co-defendant had accepted a plea agreement that included a provision barring him from testifying for either the State or the defense. Although the defendant sought to call his brother as a witness, the brother's attorney advised the court that the witness intended to "plead the Fifth," so as to not violate the plea agreement. Based on that representation, the court did not permit the defendant to call the witness. On appeal, the Court reversed the conviction.

In its discussion, the Court set forth the proper procedure with respect

-20-

to a witness's claim of privilege, It said:

> The privilege is waivable, affording no protection for
> statements voluntarily given.  Moreover, it is well settled that
> the privilege is personal to the witness.  And "because the privilege
> is not a prohibition of inquiry, but is an option of refusal," [t]he
> witness should first be called to the stand and sworn.  Interrogation
> of the witness should then proceed to the point where he asserts his
> privilege against self-incrimination as a ground for not answering
> a question.  If it is a jury case, the jury should then be dismissed and
> the trial judge should attempt to "determine whether the claim of
> privilege is in good faith or lacks any reasonable basis."  If further
> interrogation is pursued, then the witness should either answer the
> questions asked or assert his privilege, making the decision on a
> question by question basis.

*Bhagwat*, 338 Md. at 271-72 (internal citations omitted).  However, where there
is a "clear indication" that the witness intends to invoke the privilege, the Court
said that the trial court should omit the "mechanical procedure of first calling
the witness before the jury...." *Id.* at 273 (citations omitted).  The Court added
that "the questioning of the witness should not occur in front of the jury....
because of the potential for prejudice...." *Bhagwat*, 338 Md. at 273 n. 11.

In our view, the trial court properly determined, outside the jury's presence,
that Johnson had no Fifth Amendment privilege, because he was granted use
immunity.  *See Kastigar v. United States*, 406 U.S. 441, 449 (1972) (stating that
the government can compel a witness to testify if the witness obtains immunity
coextensive with the privilege).  *Hoffman v. United States*, 341 U.S. 479 (1951);
*Choi v. State*, 316 Md. 529 n. 4 (1989).  The question, then, is whether it was
proper for the State to call Johnson, knowing that he intended to refuse to testify,
without a valid privilege.

[Wood] vigorously contends that appellate cases in Maryland and the
Supreme Court have "consistently and unwaveringly held" that the conduct
of the court and the prosecutor was improper, despite the fact that Johnson had
no Fifth Amendment privilege.  Wood maintains that the validity of Johnson's
refusal to testify was only one factor for consideration, and is not controlling.
In his view, it was improper for the State to call Johnson, because Johnson's
refusal to testify added "critical weight" to the State's case, and the State im-
properly constructed its case from a testimonial privilege. [Citation omitted].
In the context of this particular case, we are not persuaded by [Wood's]
position.

*Vandergrift v. State*, 237 Md. 305 (1965), is instructive, In that case,

the defendant was convicted of assault and battery.  On appeal, the Court
considered the legal effect of a prosecutor's decision to call as witnesses
several co-defendants who had not yet been tried, knowing they would refuse
to testify on Fifth Amendment grounds.  During the testimony of the witnesses,
the State asked questions related to the crime.  The refusals to testify by persons
allegedly involved in the crime for which the defendant was on trial led to adverse
inferences implicating the defendant.

The *Vandergrift* Court announced five factors bearing on the claim of
prejudicial error resulting from the invocation by a State's witness in the jury's
presence of the Fifth Amendment privilege.  They are:

> "1.      that the witness appears to have been so closely implicated in
> the defendant's alleged criminal activities that the invocation by the
> witness of a claim of privilege when asked a relevant question tending
> to establish the offense charged will create an inference of the witness'
> complicity, which will in turn, prejudice the defendant in the eyes of
> the jury;
>
> 2.      that the prosecutor knew in advance or had reason to anticipate
> that the witness would claim the privilege, or had no reasonable basis
> for expecting him to waive it, and therefore, called him in bad faith and
> for an improper purpose;
>
> 3.      that the witness had the right to invoke the privilege;
>
> 4.      that defense counsel made timely objection and took exception
> to the prosecutor's misconduct; and
>
> 5.      that the trial court refused or failed to cure the error by an
> appropriate instruction or admonition to the jury."

*Id*. at 308-09 (citation omitted).

....Finding that four out of five factors were satisfied, the *Vandergrift* Court
determined that the actions of the prosecutor were prejudicial, and it reversed.  *Id*.
at 309.  Nevertheless, the Court made clear that the State is not always barred from
calling a co-defendant who invokes a testimonial privilege, nor does prejudicial
error always follow the invocation of privilege.  *Id*. at 309.

The appellate court noted other state cases explaining the standard articulated in *Vandergrift*.

The court observed Wood's reliance on *Namet v. United States,* 373 U.S. 179 (1963),[14] cited by the

Court of Appeals in other decision for the proposition that a defendant is unfairly prejudiced when

"inferences from a witness's refusal to answer added critical weight to the prosecution's case in a

form not subject  to cross-examination...."   The appellate court then compared the *Vandergrift*

factors with the facts of Wood's case:

> ...[T]he first *Vandergrift* factor concerns complicity between the witness
> and the accused; we consider whether "the witness appears to have been so closely
> implicated in the defendant's alleged criminal activities that the invocation....of a
> claim of privilege [by the witness] *when asked a relevant question tending to*
> *establish the offense charged* will create an inference of the witness' complicity,"
> thereby prejudicing the defendant.  *Vandergrift*, 237 Md. at 308 (emphasis
> added).  Wood relies on the State's deliberate attempt "to intertwine Johnson and
> [Wood] and prejudice [Wood] in the process."

> It is noteworthy that the prosecutor never asked Johnson "a relevant
> question tending to establish the offense charged...."  Rather, the prosecutor posed
> a single question to Johnson, aimed at establishing whether he gave a statement to
> police.  Moreover, as soon as Johnson refused to testify, the court barred the State
> from asking any other questions.  In addition, although [Wood] asserted in his
> Petition that [Wood] and Johnson were arrested at the same time, the parties have
> not characterized Johnson as a co-defendant or a person complicit in the murder.
> Indeed, Johnson had been arrested, but no charges were brought against him.

> It is equally significant that Wood's defense attorney testified at the post-
> conviction hearing that she purposefully did not oppose the State's decision to
> call or question Johnson; she believed that Johnson's conduct in refusing to testify
> could be construed by the jury as inculpatory as to Wood.  Clearly, the post-
> conviction court regarded defense counsel's explanation as credible, in that it
> found that she was not ineffective in failing to object, either when the State
> called Johnson as a witness or when it questioned Johnson about his statement.
> To the contrary, the post-conviction court found that "counsel put on a proper
> defense."  Consistent with that finding, the court pointed out elsewhere in its
> opinion that the defense attorney "spent most of her time arguing that Garland

---

[14]        In *Namet*, defendant was convicted of two counts of violating the federal wagering tax law.  The
Supreme Court found error because a government witness was required to invoke his Fifth Amendment privilege in
the presence of the jury.  The Court said that "error may be based upon a concept of prosecutorial misconduct, when
the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the
testimonial privilege." *Id*. at 186.

Johnson was also a suspect in this case and the State had no evidence linking [Wood] to the crime other than the testimony of two convicted felons, Teagan Young and Greg Jeffers, who had motives to lie." Even Wood recognized in his Petition that, in closing, his lawyer argued that Johnson's assertion of privilege "suggest[ed] that Johnson was the shooter."

We cannot overlook that the State was not allowed to pepper Johnson with a series of testimonial questions, despite the fact that, after he was immunized, he no longer had a Fifth Amendment privilege. Nor was the State allowed to introduce the content of Johnson's pretrial statement. Simply put, the State was virtually stymied once Johnson refused to testify. Therefore, the one question that was asked did not add "critical weight" to the State's case.

As to the second factor, we see no basis to find bad faith by the prosecutor in calling Johnson, although the State knew of his intended refusal to testify, because Johnson received use immunity and it was the trial judge who first invited the State to call Johnson. That Wood's lawyer never objected or requested a curative instruction further suggests that even the defense attorney did not perceive the prosecutor as having acted improperly.

As to the third factor, it is clear that, in light of the immunity, Johnson had no Fifth Amendment privilege. With respect to the fourth factor, the defense attorney never objected. The fifth factor is the only one that inures to Wood's benefit; the trial court was not asked to give a curative instruction or admonition to the jury, nor did the court determine on its own to "cure the error."

* * * *

## 2. The prosecutor did not improperly question Johnson about his statement to police

The trial court ruled that Johnson's statement to the police was inadmissible as substantive evidence. The court also denied the State's request to pose repeated questions to Johnson, so as "to force him to refuse to answer each question." The post-conviction court found, however, that the trial court barred the State altogether from propounding any questions to Johnson about his statement. Based on that finding, the post-conviction court then determined that the prosecutor flagrantly disregarded the trial court's directive and committed prosecutorial misconduct. On appeal, the State contends that the post-conviction court misconstrued the record. It observes that the trial court never prohibited the State from making any inquiry concerning Johnson's statement to the police. Rather, the State contends that the trial court only precluded the State from posing a string of questions to Johnson to force him repeatedly to refuse to answer. We agree.

We recounted earlier, in detail, the relevant colloquies. They unequivocally

establish that the post-conviction court was clearly erroneous in finding that the trial court "repeatedly told [the prosecutor] that she was not allowed to ask Johnson about his statement to the police," and that the prosecutor disregarded the trial court's ruling.  Instead, the trial court rebuffed the prosecutor's request to propound a series of questions to Johnson, and said that it would "probably" limit the prosecutor to one question.  But, the trial court's ruling that Johnson's statement was inadmissible as substantive evidence was not the equivalent of a ruling prohibiting the prosecutor from asking Johnson about whether he gave a statement to the police.  Indeed, we have combed the record and cannot find a single instance in which the trial court expressly instructed the prosecutor not to question Johnson at all about his statement to police....

\* \* \* \*

Perhaps most significant, the State did, indeed, pose just one question to Johnson, consistent with the court's comment that it would "probably" allow only one question.  When the State first began to question Johnson, the defense attorney interrupted with an objection.  At the point of interruption, the State had gotten as far as asking: "Mr. Johnson, didn't you give a statement to the –."  Following the objection, the court explicitly said to the prosecutor: "Finish the question."  Thus, the trial court authorized the State to continue, even though it was clear from the incomplete question as to what the State was asking.  If the trial court thought the prosecutor had violated its directive by referring to John-son's statement to the police, at the very least the court would not have permitted the prosecutor to complete her question.  The State then asked Johnson: "Didn't you give a statement to the police in this incident?"  Notably, the defense attorney did not renew her objection.

Accordingly, we conclude that the post-conviction court was clearly erroneous in finding that the trial court barred the State from asking Johnson about his statement to the police, and in finding that the prosecutor deliberately disregarded the trial court's directions when she posed the question to Johnson. Therefore, the court erred in finding prosecutorial misconduct on this basis.

### 3.  The State's closing argument

The issue as to the State's closing argument is a thorny one.  The post-conviction court discussed the closing argument under the heading of Prosecutorial Misconduct and as part of the discussion of cumulative errors.  It seems to have found prosecutorial misconduct and reversible error on the ground that the prose-cutor "improperly inferred in closing argument that [Wood] was implicated by Johnson."  The court relied on *Adkins* [citation omitted] and *Namet* [citation omitted] for the proposition that the State consciously sought to add "critical weight" to its case by the use of inferences rising from the assertion of a testi-

monial privilege.

The State argues that the post-conviction court erred in holding that the prosecutor improperly implicated Wood by referring to Johnson in her closing argument. Asserting that "this was not a close case," the State contends that the parties presented alternative "theories upon which to consider why Johnson refused to testify," and the prosecutor did not exceed the wide latitude generally afforded in closing argument. Wood responds that, without basis, the prosecutor argued that Johnson's silence was evidence of Wood's role as the murderer. Such argument, says Wood, was "improper" and "speculative," and amounted to "a series of calculated, highly prejudicial comments designed to mislead the jury."

As we see it, the State's comments, both in closing and rebuttal, came close to the edge of impropriety. There was no basis for the prosecutor to suggest to the jury that Johnson's refusal to testify implicated Wood. Moreover, while the evidence was more than sufficient to support the convictions, the case was not without its weaknesses. For example, there was no physical evidence tending to establish [Wood's] guilt, and the State had only one independent eyewitness, Cheyenne Robinson. She testified that while she was in her apartment on the day of the shooting, she heard a gunshot, went to her balcony, and saw the victim fall to the ground as "a guy" stood over him with a gun. Robinson also stated that the "guy" was "yelling some things at [Wallace], pacing back and forth, and then he shot him." But, she did not make an in-court identification. Instead, two cohorts of the victim, Young and Jeffers, each of whom had a prior criminal record, identified Wood as the shooter.

Nevertheless, in the context of this case, we are satisfied that the State's closing argument does not warrant post-conviction relief. As we noted, the defense attorney did not object, because she did not consider the State's closing argument as prejudicial to Wood.. The post-conviction court credited the defense attorney's conduct as sound trial strategy, and thus did not find ineffective assistance of defense counsel based on the failure to object. We do not believe that a reasonable trial strategy justifies a new trial merely because it proves unsuccessful.

Certainly, there are limits to a prosecutor's freedom to argue, in order to protect a defendant's fundamental right to a fair trial. [Citations omitted]. But, not every improper remark requires a reversal. [Citation omitted]. Instead, "[r]eversal is warranted only if 'it appears that the remarks of the prosecutor actually misled or influenced the jury to the prejudice of the accused.'" [Citation omitted]. This determination rests largely in the control and discretion of the presiding judge, and an appellate court should not reverse the trial court unless there has been an "abuse of discretion by the trial judge of a character likely to have injured the complaining party." [Citations omitted]. Ultimately, whether the

prosecutor's closing argument "exceeds the limits of permissible comment depends on the facts in each case." [Citation omitted].

Here, the trial court's jury instructions clearly defined the jury's role, the character of closing argument, the presumptions afforded the defendants, and how to assess the testimony of the witnesses.  We presume that juries follow the instructions of the trial judge. [Citations omitted].  In regard to final argument, [the trial court] told the jury:

> You're instructed that the opening statements and closing arguments of lawyers are not evidence in this case.  They're intended to help you understand the evidence and to apply the law; therefore, if your memory of the evidence differs from anything that the lawyers may say to you, you must rely upon your memory of the evidence....

> In performing your duty, as the judges of the facts in this case, you are the judges of whether or not witnesses should be believed, and that goes to all the witnesses that you've heard.  In making that decision, you may apply your own common sense and everyday experiences.... In this case, the defendant has elected not to testify.  You're instructed that he has an absolute constitutional right not to testify, and the fact that he did not testify must not be held against him.  It must not even be considered by you in any way, or even discussed by you....

> The issue of prejudice is critical.... In considering whether the prosecutor's closing remarks were unfairly prejudicial to the accused, several factors are relevant: (1) the strength of the State's case; (2) the centrality of the issue affected by the error; and (3) the steps taken by the trial judge to mitigate the effects of the remarks on the jury. [Citations omitted]....When we consider all the circumstances, we are satisfied that post-conviction relief is not warranted based on the State's closing argument.

(Paper No. 7, Exhibit 20 at 22-45).  This in-depth analysis takes into consideration both State and Supreme Court precedent and reasonably applies such precedent to the facts of this case.  Wood is not entitled to relief on this claim.

In his final claim, Wood argues that the prosecutor withheld identification evidence favorable to the defense.  The Court of Special Appeals examined this contention, and found as follows:

## B.  The pre-trial identification

Wood complained that the State improperly failed to disclose an impermissibly suggestive pretrial photographic identification involving Jeffers. The post-conviction court evidently found that the police showed Jeffers a single photograph of Wood, because it said: "The showing of a single photograph with [Wood's] name on it to a witness is relevant, exculpatory information which the State had an obligation to disclose." Further, it concluded that it was "clear" that the State's dereliction prejudiced Wood, in that defense counsel "probably" would have sought to suppress Jeffer's identification testimony had disclosure been made. In reaching its decision, the court relied on *United States v. Agurs*, 427 U.S. 97 (1976), and *Brady v. Maryland*, 373 U.S. 83 (1963).

On appeal, the State contends that the post-conviction court "applied the wrong legal standard in addressing this issue as a violation of *Brady*...." [Citation omitted]. The State asserts that the court erred in finding a *Brady* violation, because the information was not material to the defense. The State also maintains that the identification was disclosed in sufficient time for the defense to make "effective use of it." [Citations omitted].

Wood asserts that the post-conviction court properly found a violation of due process because of the State's failure to disclose that Jeffers had been shown a single photograph with [Wood's] name on it. He characterizes as "absurd" the State's contention that there was no *Brady* violation merely because the evidence was disclosed late, by happenstance, "as opposed to not being disclosed at all...." [Wood] also agrees with the post-conviction court that, if the State had made a timely disclosure, the defense surely would have sought to suppress Jeffer's identification testimony. Moreover, because "the out-of-court identification process was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification," Wood maintains that "the out-of-court identification likely would have been excluded."

As we indicated, the prosecutor did not testify at the post-conviction hearing, so we have no explanation by the State for what occurred. Nevertheless, at trial, Jeffers expressly said that he was "not sure" whether he had been shown just "one picture by itself." Therefore, the post-conviction court was incorrect in concluding that the State showed Jeffers just one photograph. Moreover, the defense attorney seemed to indicate in her testimony that she did not object or pursue the matter because she thought Jeffers knew her client....

* * * *

We quoted earlier from Jeffer's trial testimony and his pre-trial statement. *See* pages 4-5, *supra*. The jury could have determined that Jeffers knew Wood before the date of the murder, although they were not friends, and certainly could have determined that Jeffers knew Wood well enough from the altercation to

-28-

enable Jeffers to identify him.  Therefore, even if Jeffers was shown just one photograph, and even if Jeffers did not know Wood, we see no merit to Wood's contention.  We explain.

The claim of impermissible suggestiveness in regard to a photographic identification is founded upon principles of due process.  *See Moore v. Illinois*, 434 U.S. 220, 227; *United States v. Wade*, 388 U.S. 218 (1968); *Stovall v. Denno*, 388 U.S. 293 (1967).  Due process "protects the accused against the introduction of evidence of, or tainted by, an unreliable pretrial identification obtained through un-necessarily suggestive procedures."  *Moore*, 434 U.S. at 227; [other citations omitted].  It also guards against an "'irreparable mistaken identification.'" [Citation omitted].  The due process claim must be evaluated based on the totality of the circumstances. [Citation omitted].

* * * *

Certainly, the risk of prejudice "'will be increased if the police display to the witness only one picture of a single individual who generally resembles the person he saw, or if they show him pictures of several persons among which the photograph of a single individual recurs or is in some way emphasized.'" [Citations omitted]. [Wood] concedes, however, that neither a one-on-one confrontation nor the display of a single photograph of a suspect to a witness is, without more, grounds for excluding evidence of an extrajudicial identification. [Citations omitted].  Rather, "The test of admissibility is 'whether under the totality of the circumstances the identification was reliable even though the con-frontation procedure was suggestive.'" *Webster*, 299 Md. at 601 (quoting *Neil v. Biggers*, 409 U.S. 188, 199 (1972)).

If a pretrial identification is found suggestive, several factors are relevant to evaluate the likelihood of misidentification.  Relying on *Neil v. Biggers*, 409 U.S. 199-200, the *Webster* Court identified the following criteria: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's  prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; (5) and the length of time between the crime and the confrontation.  *Webster*, 299 Md. At 602.

(Paper No. 7, Exhibit 20 at xx -52).  The appellate court found that the State's failure to disclose the pretrial identification did not result in a due process violation, and further found that Jeffers's identification was reliable.  After discussing *Brady v. Maryland,* 373 U.S. 83, 87 (1963), the court went on to explain:

...[T]he State is required to "disclose evidence favorable to the accused that if suppressed, would deprive the defendant of a fair trial." [Citation omitted].

To establish a due process violation that justifies a new trial, a defendant must show: (1) the prosecutor suppressed or withheld evidence; (2) the evidence was favorable to the defense, either because it was exculpatory, provided a basis for mitigation or sentence, or provided grounds for impeaching a witness; and (3) the suppressed evidence was material to the guilt or punishment of the defendant. [Citation omitted].

In cases in which the prosecutor allegedly failed to disclose evidence favorable to the defense, the failure is material if "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine the confidence in the outcome.'" [Citations omitted]. As the Supreme Court said in *Strickler*, 527 U.S. at 281, "there is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Moreover, the defense bears the burden to establish a reasonable probability of a different result.

* * * *

[Wood] contends that, if the State had disclosed that Jeffers identified Wood based on a single photograph shown to him, the defense would like have obtained the suppression of Jeffers's out-of-court identification and "perhaps" the in-court identification. As we have said, assuming, *arguendo*, that Jeffers saw just one photograph, his identification would not necessarily have been suppressed, because the State could establish its reliability, under *Biggers*. Looking at the factors pertinent to that assessment, we are not aware of any basis to indicate that the identification was unreliable. Moreover, such evidence was not material, as defined by *Brady* and its progeny, because it was not sufficient to undermine confidence in Wood's conviction.

The state appellate court's ruling on this claim constitutes a reasonable application of

Supreme Court precedent to the facts of this case, and thus withstands review under 28 U.S.C.

§ 2254(d).

For the foregoing reasons, the instant Petition for Habeas Corpus Relief is denied and

dismissed. A separate Order shall be entered accordingly.

-30-

February 28, 2007                          /s/ _____
    Date                                        RICHARD D. BENNETT
                          UNITED STATES DISTRICT JUDGE